Not for Publication

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EILEEN RAPOSA, MICHAEL L. RAFFO, VALERIE LANE, LOGAN HORNBACK, & CYNTHIA KELLEY, <br><br> Plaintiffs, <br><br> v. <br><br> VOLKSWAGEN GROUP OF AMERICA, INC., <br><br> Defendant. | Civil Action No.: 22-5896 (ES) (ESK) <br><br> Consolidated <br><br> OPINION |

SALAS, DISTRICT JUDGE

Plaintiffs Eileen Raposa, Michael L. Raffo, Logan Hornback, Cynthia Kelley, and Valerie Lane bring this putative class action alleging violations of state statutory law, state tort law, and federal law stemming from the inoperability of internet connectivity services in their automobiles. (D.E. No. 23 ("Amended Complaint" or "Am. Compl.")). Before the Court is a motion to compel arbitration (D.E. No. 30 ("Motion to Compel Arbitration")) and a motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (D.E. No. 31 ("Motion to Dismiss")) filed by Defendant Volkswagen Group of America, Inc. ("VWGoA"). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, Defendant's Motion to Compel Arbitration and Motion to Dismiss are **DENIED** *without prejudice* pending limited fact discovery on the issue of arbitrability.

1

I.      BACKGROUND

A.      Factual Allegations

Plaintiffs in this putative class action allege that they owned or leased certain Volkswagen and Audi vehicles[1] (the "Class Vehicles") in "early 2022." (Am. Compl. ¶ 1). According to Plaintiffs, Defendant VWGoA is a New Jersey corporation that "'houses the U.S. operations' of a worldwide family of brands including Volkswagen, Audi, Bentley, Bugatti, and Lamborghini brands." (*Id.* ¶ 12). Defendant is allegedly "the 'licensed manufacturer' of the Class Vehicles," and "designed, manufactured[,] distributed, marketed, and sold the Class Vehicles, through its extensive network of authorized dealerships in the United States." (*Id.*). Defendant allegedly "manufactures, sells and markets its Audi brand through . . . Audi of America ('Audi')" and "developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles." (*Id.*).

Plaintiffs allege that the Class Vehicles' internet-enabled features "were rendered inoperable" when major wireless carriers phased out "3G" beginning "in 2022 due to [D]efendant's use of obsolete telematics[2] equipment it installed in the Class Vehicles." (*Id.* ¶ 1). More specifically, Plaintiffs allege that in or about 2014, Volkswagen started to offer "Car-Net," an internet connected car service. (*Id.* ¶ 32). Car-Net operated on "Volkswagen's 3G-only telematic system." (*Id.*).[3] Regarding Audi, Plaintiffs allege that the Audi Class Vehicles "are

---

[1]      These vehicle types include: Audi 2014–2016 A3, 2016–2018 A3 e-Tron, 2013–2015 Allroad/A4/A5/Q5, 2016 A4/Allroad, 2017–2018 Allroad/A4, 2016–2017 A5, 2018 A5, 2012–2015 A6/A7/A8/Q3/Q7, 2016–2017 A8/Q5, 2018 A8, 2015–2018 Q3, 2018 Q5, 2016 Q7, 2017–2018 Q7, 2019 RS5; and Volkswagen 2014–2019 Passat/Jetta/Tiguan/Beetle, 2014–2019 EOS, 2018–2019 Atlas, 2018–2019 Arteon, 2014–2019 GolfR/GolfD/Golf/eGolf, 2014–2019 GTI, 2014–2019 Golf SportWagen, and 2014–2018 CC. (Am. Compl. ¶ 17).

[2]      Telematics capabilities are described as supporting "internet enabled features such as roadside emergency safety features." (*Id.* ¶ 1).

[3]      Defendant explains that "Volkswagen Car-Net is VWGoA's name for the connected services available in certain Car-Net equipped vehicles, which include features such as emergency call services and Automatic Crash

equipped with 'Telematics Control Units' ('telematics') connected to the engine control module which are the instruments which connect the Audi to internet service ('Audi Connect')."[4]  (*Id.* ¶ 33).  Allegedly, both the Volkswagen Car-Net features and the Audi Connect features "depend on the equipment and technology of the telematics systems, not contracts with service providers." (*Id.* ¶¶ 32–34).

Plaintiffs allege that warranties were provided with the Class Vehicles.  (*Id.* ¶¶ 48–51). Specifically, Plaintiffs assert that "Volkswagen's New Vehicle Limited Warranty covers 'defects in manufacturer's material and workmanship,' and is limited to '4 years or 50,000 miles from your vehicle's in-service date, which[ever] occurs first.'"  (*Id.* ¶ 48).  Audi's provided warranty, the "New Vehicle Limited Warranty," allegedly covers "'defects in manufacturer's material and workmanship,' and is limited to '4 years or 50,000 miles from your vehicle's in-service date, which[ever] occurs first.'"  (*Id.* ¶ 49).  Plaintiffs assert that the "warranty booklets provided to Plaintiffs and consumers by VWGoA are done so with the explicit permission and direction of Volkswagen of North America."  (*Id.* ¶ 50).  Plaintiffs also note that the warranty booklets are not available to view online prior to purchase.  (*Id.* ¶ 51).

Plaintiffs assert that the Class Vehicles were equipped with 3G-only, non-adaptable systems, despite the fact that "[a]ll manufacturers of 3G devices have long known that 3G was 'spectrally inefficient' and would be phased out as early as possible."  (*Id.* ¶ 36).  In fact, they allege that "[a]s early as August 2009, carriers supporting 3G began planning their upgrade to 4G

---

Notification. . . . To operate, Car-Net requires a vehicle equipped with certain hardware and software (including a modem and antenna), together with vehicle cellular connectivity and availability of the GPS signal."  (Mov. Br. at 2–3).

[4]      Defendant explains that "Audi [C]onnect is Audi of America's name for the connected services available in certain Audi vehicles."  (*Id.* at 11).

LTE," and that "by 2014 3G was already being replaced by 4G LTE." (*Id.* ¶¶ 37–38).  According to the Amended Complaint:

> There was no disclosure or even suggestion that Car-Net or Audi-Connect would be rendered obsolete once 3G was phased out or that the Audi-Connect and/or Car-Net features were only temporary or had only a limited life.  As to the later model years after 4G became prevalent, Defendant never disclosed that its equipment was one generation behind the standard!  To the contrary, Defendant marketed the features as a permanent features of the Class Vehicles.

(*Id.* ¶ 39).  Plaintiffs additionally allege that Volkswagen and Audi knew of the upcoming switch and "could have manufactured telematics adaptable to the next generation" or at least "design the [3G] telematics to be retrofitted" or fix the systems after it became clear that 3G was a thing of the past, which Defendants allegedly refused to do.  (*Id.* ¶ 40–45).

Plaintiffs allege that in February 2019, AT&T announced a plan to "sunset"[5] its 3G network—a move soon followed by other carriers.  (*Id.* ¶ 52).  Following that announcement, Plaintiffs allege that Defendant still "sold hundreds of thousands of 3G Only Telematics equipped vehicles." (*Id.* ¶ 53).  According to Plaintiffs, after the phase out, the Class Vehicles lost the ability to perform a variety of internet-based services.  (*Id.* ¶¶ 54–57).  Plaintiffs assert that the proffered solution by Audi was to install "Motion for Audi Connect'" on their vehicles, which "requires cutting into the storage 'cubby' on some vehicles and does not restore all prior functions including but not limited to window or door monitors or the 'lock/unlock' features."  (*Id.* ¶ 58).  Plaintiffs allege that "Volkswagen's solution is to offer owners of the affected vehicles a 'special price' of $295 for 'Motion by Mojio' which requires the buyer to pay additional subscription fees."  (*Id.* ¶ 59).  Plaintiffs allege that the inoperable telematics lowered the value of the Class Vehicles.  (*Id.* ¶¶ 2 & 92).  Plaintiffs further allege that "[h]ad the Defendant truthfully disclosed and reported

---

[5]      "Sunsetting" is described as meaning that "a mobile network operator (or carriers) shuts off the cellular infrastructure required to operate devices based on 3G technology."  (Am. Compl. ¶ 52).

that its telematics for the Class Vehicles were 3G only, consumers would have been less likely to purchase the cars, would have abstained outright[,] or sought substantial discounts and/or upgrades." (*Id.* ¶ 60).

### B.    Procedural History

Based on the forgoing facts, on October 5, 2022, Plaintiff Raposa initiated suit against Volkswagen Group of America, Inc.; Audi AG; and Volkswagen AG. (D.E. No. 1 ("Compl.")). On October 24, 2022, Plaintiff Raffo filed a related but separate action against Volkswagen Group of America, Inc.; and Volkswagen AG. (*Raffo v. Volkswagen Group of America et al.*, Civil Action No. 22-6230 (D.E. No. 1)). On March 3, 2023, the Honorable Edward S. Kiel, U.S.M.J. entered an order consolidating the two cases and designating *Raposa v. Volkswagen Group of American, Inc.*, Civil Action No. 22-5896 as the lead case. (D.E. No. 19). On March 24, 2023, Plaintiffs filed a consolidated amended class action complaint. (Am. Compl.). The Amended Complaint added Named Plaintiffs Michael L. Raffo, Nicole Goodfleis, Logan Hornback, Tony Gundolf, Ashley Davis, Cynthia Kelley, Valerie Lane and Nicole Medley.[6] (*Id.* at 1). Audi AG and Volkswagen AG were removed as defendants in the Amended Complaint, leaving only Defendant VWGoA. (*Id.*). The Amended Complaint asserts claims including: (i) violations of New Jersey's Consumer Fraud Act, N.J.S.A. § 56:8-2, *et seq.* (Count I); (ii) breach of express by description and implied warranty, in violation of N.J. Stat. § 12A (Count II); (iii) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2310(d)1(A) (Count III); (iv) violation of the New York General Business Law § 349(A) (Count IV); (v) violation of the New York General Business Law § 350 (Count V); (vi) violations of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §

---

[6]     On May 25, 2023, former plaintiffs Nicole Goodfleis, Tony Gundolf, Ashley Davis, and Nicole Medley were voluntarily dismissed from this action. (D.E. Nos. 28 & 29).

367.110 *et seq.* (Count VI); (vii) breach of express warranty in violation of Ky. Rev. Stat. §§ 335.2–313 and 355.2A-210 (Count VII); (viii) breach of implied warranty of merchantability in violation of Ky. Rev. Stat. §§ 335.2-314 and 355.2A-212 (Count VIII); and (ix) unjust enrichment (Count IX).[7]  (*Id.* ¶¶ 93–185).

On June 16, 2023, Defendant filed a motion to compel arbitration (Motion to Compel Arbitration; *see also* D.E. No. 30-1 ("Mov. Br.")).  The Motion is fully briefed.  (D.E. No. 34 ("Opp. Br."); D.E. No. 37 ("Reply")).  That same day, Defendant also filed a motion to dismiss the Amended Complaint.  (Motion to Dismiss).[8]

## II.    LEGAL STANDARD

"Before compelling a party to arbitrate pursuant to the [Federal Arbitration Act (the "FAA")], a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement."  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009).  A court is required to order that the parties proceed with arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue."  9 U.S.C. § 4.  By contrast, "[i]f a party has not agreed to arbitrate, the courts have no authority to mandate that he do so."  *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999).  "When the very existence of . . . an [arbitration] agreement is disputed, a district court is correct to refuse to compel arbitration until it resolves the threshold question of whether the arbitration agreement exists."  *Guidotti v. Legal Helpers Debt*

---

[7]        Counts I–III are asserted on the behalf of Plaintiffs and all putative class members; Counts IV and V are asserted by Plaintiffs Raffo and Lane on behalf of a "New York Sub-Class"); Counts VI–VIII are asserted by Plaintiff Hornbeck on behalf of the "Kentucky State Sub-Class"; Count IX is asserted by all Plaintiffs on behalf of the "New York, New Jersey, and Kentucky Sub-Class."  (Am. Compl. ¶¶ 93–185).

[8]        The parties filed identical briefing in connection with an identical motion to dismiss and identical motion to compel arbitration filed by Defendant in *Raffo v. Volkswagen Group of America et al.*, Civil Action No. 22-6230, which was consolidated under lead case *Raposa v. Volkswagen Group of American, Inc.*, Civil Action No. 22-5896 (D.E. Nos. 22–23, 26–29).  As such, this Opinion addresses those motions as well.

*Resolution, L.L.C.*, 716 F.3d 764, 775 n.5 (3d Cir. 2013).   Nevertheless, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp. Ala. v. Randolph*, 531 U.S. 79, 91 (2000).

## III.   DISCUSSION

In its moving brief, Defendant asserts that Plaintiffs implicitly or explicitly entered into arbitration agreements (the "Arbitration Agreements") which cover the claims asserted in the Amended Complaint.   (Mov. Br. at 2 –16).   More specifically, Defendant asserts that the internet services available on the Class Vehicles—Car-Net and Audi Connect (the "Internet Services")— came with Terms of Service which included arbitration clauses.   (*Id.*).

First, regarding Volkswagen Car-Net, Defendant alleges that "[a]ll new Car-Net equipped 2014-2019 model year vehicles were sold with a hard copy of the VW Car-Net Security & Service Terms of Service & Privacy Policy ('Car-Net Terms of Service') in the glove box, as well as a trifold brochure regarding VW Car-Net."   (*Id.* at 3).   Defendant adds that a brochure about Car-Net was made available to customers by the dealer during the purchase process.   (*Id.*).   Defendant alleges that the trifold and brochure "explained the Car-Net services, specifically referenced the applicable Car-Net Terms of Service, and provided the web address where customers could access those Terms."   (*Id.* at 3–4).   Defendant further contends that "the Owner's Manuals supplied in each vehicle's glove box explained the Car-Net services and referred owners to the website . . . where they could access the applicable Terms of Service."   (*Id.* at 4).   These Terms of Service allegedly state:

> "You will not be able to use the Service unless you agree to these Terms of Service.   Please read these Terms of Service before you start using the Service."   Further, "[i]n order to use the Service, you must agree to these Terms of Service."   "Service" is defined as "Volkswagen Car-Net Security & Service personal assistance and safety services" and notifies the purchaser or lessee that "Your

> Vehicle contains hardware and software ('Equipment') that enables
> you to receive "the Service."

(*Id.* at 5 (internal citations omitted)).   Defendant additionally alleges that "Automatic Crash Notification," a Car-Net feature, "was enabled at the time of initial sale for up to six months 'without activating a trial or paid subscription.'"   (*Id.* at 4).   Thus, Defendant argues, "[b]y taking possession of their vehicles and utilizing the Automatic Crash Notification Service, all owners accepted the Terms of Service."   (*Id.* at 5).   Defendants also allege that "customers were also required to accept the Car-Net Terms of Service in order to access the free trial or . . . paid subscription to Car-Net."   (*Id.* at 6).

Those Car-Net Terms of Service, Defendant alleges, contain an arbitration agreement (the "Car-Net Arbitration Agreement") regarding the Car-Net services.   (*Id.* at 4–5).   Specifically, Defendant alleges that the Car-Net Arbitration Agreement states:

> ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THESE TERMS OF SERVICE, OR TO ANY PRODUCT OR SERVICE PROVIDED UNDER OR IN CONNECTION WITH THESE TERMS OF SERVICE, WILL BE SETTLED BY INDEPENDENT ARBITRATION INVOLVING A NEUTRAL ARBITRARTOR AND ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") UNDER WIRELESS INDUSTRY ARBITRATION ("WIA") RULES, AS MODIFIED BY THESE TERMS OF SERVICE. . . . IN ALL ARBITRATIONS, THE ARBITRATOR MUST GIVE EFFECT TO APPLICABLE STATUTES OF LIMITATIONS AND WILL DECIDE WHETHER AN ISSUE IS ARBITRABLE OR NOT.

(*Id.* at 7–8; D.E. No. 30-3[9] at 23 & 24).   Defendant adds that the Car-Net Arbitration Agreement contains a class waiver provision stating:

> EVEN IF APPLICABLE LAW PERMITS CLASS ACTIONS OR CLASS ARBITRATION, YOU EXPRESSLY WAIVE ANY RIGHT TO PURSUE ON A CLASS BASIS ANY SUCH CONTROVERSY OR CLAIM AGAINST VZT, A

---

[9]   Unless otherwise noted, pin cites to Docket Entry Numbers 30-3 and 30-4 refer to pagination automatically generated by the Court's electronic filing system.

> VOLKSWAGEN COMPANY OR ANY OR OUR SERVICE
> PARTNERS, OR ANY OF OUR RESPECTIVE AFFILIATES,
> OFFICERS, DIRECTORS, AGENTS, PARTNERS, LICENSORS,
> EMPLOYEES OR PREDECESSORS IN INTEREST.

(Mov. Br. at 8; D.E. No. 30-3 at 23).  Defendant further alleges that it is an intended third-party

beneficiary to the Car-Net Arbitration Agreement because

> [t]he Terms of Service explain that [t]he Service is provided to you,
> the Vehicle owner or lessee ("you" or "your"), by Verizon
> Telematics, Inc. ("VZT") on behalf of Volkswagen of America, Inc.,
> an operating division of Volkswagen Group of America, Inc.
> ("VWoA")." . . . In addition, "[t]he *subsidiaries and affiliates* of
> VWoA, including but not limited to Volkswagen AG (together with
> VWoA, the 'Volkswagen Companies') are third-party beneficiaries
> under these Terms of Service and the protections set forth in these
> Terms of Service, including without limitation, the disclaimers of
> warranties and limitations of liability in these Terms of Service,
> shall extend to them."

(Mov. Br. at 4–5 (quoting D.E. No. 30-3 at 15) (emphasis added)).

Defendant alleges that the named Plaintiffs with Volkswagen vehicles all implicitly or

explicitly accepted the Car-Net Terms of Service, and thus the Car-Net Arbitration Agreement.

(Mov. Br. at 8–10).  More specifically, Defendant asserts that Plaintiff Kelley "activated the six-

month free trial [for Car-Net] and accepted the Car-Net Terms of Service."  (Mov. Br. at 8).

Defendant admits that it "has not been able to locate any records to show exactly how the six-

month trial was activated," but notes that "whether via the dealer or by pushing the 'i' button in

the vehicle, in order to activate the New Vehicle Trial, Plaintiff Kelley was presented with and

was required to accept the [Car-Net] Terms of Service."  (*Id.* at 9).  Defendant concedes that Kelley

was the only Volkswagen-affiliated Named Plaintiff to activate the Car-Net free trial, and that

none of the Volkswagen-affiliated Named Plaintiffs ever actually subscribed to Car-Net.  (*Id.* at

8–10).  Defendant appears to argue that the other Named Plaintiffs with Volkswagen vehicles—

Raffo, Hornback, and Lane[10]—accepted the Car-Net Terms of Service, and thus the Car-Net Arbitration Agreement, implicitly, by purchasing their used vehicles which allegedly came equipped with Car-Net and in which "the [Car-Net] Terms of Service were included in the glove box materials when sold as a new vehicle."  (*Id.* at 9–10).

Second, regarding Audi Connect, Defendant indicates that the only Named Plaintiff associated with an Audi vehicle is Raposa, who purchased a 2018 Audi vehicle.  (Mov. Br. at 11; *see* also Complaint at 2).[11]  Defendant alleges that "[f]or the 2018 model year vehicles, there were three tiers of service: Audi [C]onnect CARE, PRIME, and PLUS. . . . Audi [C]onnect CARE was provided for all vehicles at no charge. . . . PRIME and PLUS were offered as 6-month free trials and were available by subscription following expiration of the trial."  (Mov. Br. at 11–12). Defendant further asserts that "Audi of America's process at the time Plaintiff Eileen Raposa purchased her 2018 Audi A5 Sportback was to have the dealer activate [Audi] [C]onnect CARE at the time of initial delivery of a new or Certified Pre-Owned vehicle."  (*Id.* at 11).  Defendant alleges that during that process, dealers were directed to make the buyer review the "Audi Connect Terms of Service" as well as sign a consent form for the Audi Connect CARE Plan, which "states that 'You must either accept or decline the Plan and sign below prior to taking delivery of your vehicle,' and refers the customer to the Audi [C]onnect Terms of Service, which they must accept in order for CARE to remain active on their vehicle.'"  (*Id.*).  Further, Defendant alleges that

---

[10]   Defendant additionally asserts that Plaintiff Lane does not own the Volkswagen vehicle at issue, and that the vehicle instead is owned by "Daniel J. Lane, Jr." (Mov. Br. at 10).  Plaintiffs respond that "Plaintiff Valerie Lane, wife of owner Daniel Lane, withdraws her claims." (Opp. at 1).  The Court construes this statement by Plaintiffs as a request for voluntary dismissal of Plaintiff Lane, which the Court grants.  Plaintiff Lane's claims are thus DISMISSED.

[11]   The Court points out that while the Amended Complaint still names Raposa as a plaintiff, it contains no factual allegations about her or her vehicle nor lists her in the "parties" section. (Am. Compl. at 1–2).  The original Complaint lists Raposa as a party and describes her vehicle as a 2018 Audi A5. (Compl. ¶ 3).  This discrepancy does not bear on the outcome of this Opinion, but the Court notes that it may become relevant in a future motion to dismiss.

dealers were told to assist the buyer in creating a "myAudi"[12] account, which required accepting the myAudi Terms of Service.  (*Id.*).  Defendant notes that after a buyer created a myAudi account, PRIME and PLUS trials "were activated by the dealer if the customer desired them, and as part of that trial activation process, the customer was required to accept the Audi [C]onnect Terms of Service."  (*Id.* at 11–12).

As with Car-Net, Defendant alleges that the Audi Connect and myAudi Terms of Service contained an Arbitration Agreement (the "Audi Connect Arbitration Agreement").  (*Id.* at 13).  Specifically, the Agreement states:

> ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THESE TERMS OF SERVICE, OR TO ANY PRODUCT OR SERVICE PROVIDED UNDER OR IN CONNECTION WITH THESE TERMS OF SERVICE, WILL BE SETTLED BY INDEPENDENT ARBITRATION INVOLVING A NEUTRAL ARBITRATOR AND ADMINISTERED BY THE BETTER BUSINESS BUREAU ("BBB") UNDER BBB ARBITRATION RULES, AS MODIFIED BY THESE TERMS OF SERVICE. . . . IN ALL ARBITRATIONS, THE ARBITRATOR MUST GIVE EFFECT TO APPLICABLE STATUTES OF LIMITATIONS AND WILL DECIDE WHETHER AN ISSUE IS ARBITRABLE OR NOT

(*Id.* at 13–14; D.E. No. 30-4 at 24 & 25).  The Audi Connect Arbitration Agreement also allegedly contains a class waiver stating:

> EVEN IF APPLICABLE LAW PERMITS CLASS ACTIONS OR CLASS ARBITRATIONS, YOU EXPRESSLY WAIVE ANY RIGHT TO PURSUE ON A CLASS BASIS ANY SUCH CONTROVERSY OR CLAIM AGAINST AOA, ANY AUDI COMPANY5 OR ANY OF OUR SERVICE PARTNERS, OR ANY OF OUR RESPECTIVE AFFILIATES, OFFICERS, DIRECTORS, AGENTS, PARTNERS, LICENSORS, EMPLOYEES OR PREDECESSORS IN INTEREST.

---

[12]    Defendant does not explain what a myAudi account is or what it is for, though it seems to be a prerequisite for using the Audi Connect services.  (*See* Mov. Br. at 11–12).

(Mov. Br. at 14–15; D.E. No. 30-4 at 24).  Defendant again asserts that it is a third-party beneficiary of the Audi Connect Arbitration Agreement because the Audi Connect Terms of Service "provides that the *'parent, subsidiaries, and affiliates* of VWoA, including but not limited to Volkswagen AG and Audi AG (together with AoA, the "Audi Companies") are third-party beneficiaries under these Terms of Service….'"  (Mov. Br. at 13 (citing D.E. No. 34 at 11 (emphasis added)).

Defendant alleges that Raposa's Audi vehicle "included Audi [C]onnect CARE, as reflected in the . . . label that would have been on the window or in the vehicle at the time of purchase." (*Id.* at 12).  Defendant further alleges that an Audi Connect brochure was included in the glove box of Raposa's vehicle at purchase, which "directed the customers to the Audi [C]onnect Terms of Service generally, and the arbitration provision in those Terms specifically, and further referred owners such as Ms. Raposa to the website, where the Terms of Service could be viewed." (*Id.*).  Defendant asserts that its "records reflect that Ms. Raposa created a myAudi account on or before November 30, 2017," and that "[i]n order to create that account, Plaintiff Raposa had to accept the hyperlinked myAudi Terms of Service, including the arbitration provision." (*Id.* at 15).

Thus, Defendant argues, all Named Plaintiffs are parties to binding arbitration agreements (the Car-Net Arbitration Agreement and the Audi Connect Arbitration Agreement (collectively, the "Arbitration Agreements")) contained within the applicable Terms of Service (the Car-Net Terms of Service and the Audi Connect Terms of Service (collectively, the "Terms of Service")) which govern their claims.  And, Defendant argues, Defendant can enforce the Arbitration Agreements as a third-party beneficiary.  Defendant further contends that its Motion to Compel Arbitration should be considered under a Rule 12(b)(6) standard, instead of the Rule 56 summary judgment standard, because "the complaint and the documents relied upon therein show the matter

is subject to arbitration." (Mov. Br. at 16).   More specifically, Defendant argues that the Court may consider the Arbitration Agreements because they are relied upon by the Amended Complaint, as the Agreements relate to the connected services at issue and "[t]he core allegation in [the] Amended Complaint is that [Plaintiffs] were damaged by the loss of [those] connected services when AT&T shut down the 3G wireless network that the vehicles depended upon for connectivity," and "access to these connected services required agreement to the Terms of Service," which contained the Agreements. (*Id.* at 17–18; Reply at 3). Defendant adds that the Terms of Service which contain the Agreements "directly address and disclose" the possibility of a loss of connectivity referenced by and relied upon by the Amended Complaint. (Reply at 2 & 3 n.2). Defendant further asserts that the Amended Complaint's general references to misrepresentations in "warranties" and "advertising, promotion, and marketing" are "sufficient to encompass the various other materials discussed and attached to the Declarations submitted in support of this Motion, including the Terms of Service, Monroney labels, brochures, and other materials." (Mov. Br. at 18 n.8).

In response, Plaintiffs argue (i) that Defendant has no actual proof that Plaintiffs assented to the Arbitration Agreements, beyond mere speculation that Plaintiffs read (rather than affirmatively agreed to) the Terms of Service; (ii) that any agreement to arbitrate cannot be implied, as Defendant has not established "knowledge or constructive notice by any Plaintiff"; (iii) that Defendant is not a third-party beneficiary to the Arbitration Agreements because "Defendant is not a signatory nor named in the VW TOS list of Third Party Beneficiaries"; (iv) that neither the Terms of Service nor the Arbitration Agreements cover the asserted claims; (v) that any arbitration argument has been waived "through [Defendant's] own conduct and by virtue of its conduct in this action evincing an intent to litigate not arbitrate"; (vi) that the Terms of Service and the Arbitration

Agreements are unconscionable and thus invalid due to their one-sidedness;  and (vii) that the class waivers are invalid due to unconscionability.  (Opp. at 16–23).  Plaintiffs additionally assert that the summary judgment standard, rather than the Rule 12(b)(6) standard, applies to Defendant's motion, as "the face of the complaint does not mention the . . . Service, [Terms of Service,] or even anything about the sales process."  (Opp. at 15).  Plaintiffs add that Defendant "fails to explain how the [Terms of Service] are inferred as incorporated from reference in the complaint to a specific brochure which Defendant[] cannot establish were ever received by Plaintiffs."  (*Id.*).

As explained below, because the affirmative defense of arbitrability is not apparent on the face of the Amended Complaint or documents integral to or relied upon therein, the Court finds that Defendant's Motion to Compel Arbitration must be denied pending limited discovery on the issue of arbitrability.

When a Court is asked to determine whether a valid arbitration agreement exists, it must first decide whether to use the Rule 12(b)(6) or Rule 56 standard of review.  *See Guidotti*, 716 F.3d at 776.  "[W]hen it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'"  *Id.* (quoting *Somerset Consulting, LLC v. United Cap. Leaders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).  Further, even where an agreement to arbitrate is not explicitly mentioned on the face of the complaint and is not attached as an exhibit to the complaint, a court may properly consider the agreement under Rule 12(b)(6) if it is integral to or explicitly relied upon in the complaint or has been incorporated by reference into the complaint based on a plaintiff's allegations.  *See e.g., CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 168 n.2 (3d Cir. 2014); *George v. Midland Funding, LLC*, No. 18-15830, 2019 WL 2591163, at *3 (D.N.J.

June 25, 2019); *Stacy v. Tata Consultancy Servs.*, No. 18-13243, 2019 WL 1233081, at *5 (D.N.J. Mar. 14, 2019).  For example, some courts in this Circuit have found an arbitration agreement to be incorporated by reference in a complaint where the underlying claims are based on agreements that contain the disputed arbitration provisions or where the complaint references an agreement that contains the arbitration provision.  *See CardioNet, Inc.*, 751 F.3d at 168 n.2.; *George*, 2019 WL 2591163, at *3.

The Third Circuit has provided that it is inappropriate to consider a motion to compel arbitration under a Rule 12(b)(6) standard in two instances: (i) if "the complaint and its supporting documents are unclear regarding the agreement to arbitrate," or (ii) "if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue."  *Guidotti*, 716 F.3d at 776.  Under either scenario, "the non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement."  *Id.* at 774.  "After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard." *Id.*; *see also Discovery House v. Advanced Data Sys. RCM, Inc.*, No. 19-21602, 2020 WL 6938353, at *4 (D.N.J. Nov. 25, 2020).

Pursuant to *Guidotti*, the Court cannot decide Defendant's Motion to Compel Arbitration on a Rule 12(b)(6) standard and without discovery because the Amended Complaint lacks the requisite clarity to establish that the parties agreed to arbitrate Plaintiffs' claims.  To start, the Amended Complaint makes no explicit reference to the Arbitration Agreements, or the Terms of Service which allegedly contain the Arbitration Agreements.  Nor are the Terms of Service or the Arbitration Agreements attached to the Amended Complaint as exhibits.  (*See generally* Am. Compl.).  Rather, the Terms of Service and the Arbitration Agreements were filed for the first time

in connection with Defendant's Motion to Compel Arbitration.  (*See* D.E. Nos. 30-3 and 30-4).

Thus, the Amended Complaint does not explicitly rely on the Terms of Service or Arbitration

Agreements.  *See Lepore v. SelectQuote Ins. Servs.*, No. 22-3390, 2023 WL 8469761, at *2 (3d

Cir. Dec. 7, 2023) ("The Complaint does not explicitly mention or cite the Agreement, which

therefore is not 'explicitly relied upon' in the Complaint.").

Nor are the Terms of Service and their contained Arbitration Agreements integral to the

Amended Complaint.  A document is "integral" to the complaint where the plaintiff has "relied

upon these documents in framing the complaint."  *In re Burlington Coat Factory Sec. Litig.*, 114

F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks omitted).  Similarly, courts find that "[a]

document is integral to the complaint if it, 'by its very existence, and not the mere information it

contains, gives rise to the legal rights asserted.'"  *Santana v. A.L. Recovery*, LLC, No. 18-0016,

2018 WL 3912830, at *4 (W.D. Pa. Aug. 16, 2018).  As the Third Circuit has recently explained:

> Our caselaw has not articulated an explicit test to govern when a
> document is integral to a complaint despite being first entered onto
> the record in response to the complaint.  But we have permitted
> courts to consider such a document if the claims asserted in the
> complaint depend on its contents, such as when those contents
> establish the right that the plaintiff claims was infringed or when
> they constitute the unlawful conduct for which the plaintiff seeks to
> recover.

*Lepore*, 2023 WL 8469761 at *2.

The Arbitration Agreements here do not meet that standard.  Plaintiffs' allegations do not

"turn on the 'terms and conditions' of" an agreement that "contains the subject arbitration

provision"—i.e., the Terms of Service.  *See George*, 2019 WL 2591163 at *3.  Plaintiffs do not

allege violation of the Terms of Service as the basis for their claims; rather, Plaintiffs' claims stem

from the alleged depreciation in value of their vehicles due to alleged violations of state and federal

law.  *See Hubbard v. Comcast Corp.*, No. 18-16090, 2019 WL 2866067, at *2 (D.N.J. July 3,

16

2019) (declining to apply Rule 12(b)(6) where the complaint neither referenced the arbitration agreement nor attached it as an exhibit to the complaint and finding that plaintiffs' claim did not stem from the existence of an arbitration agreement).  Further, there is no indication that Plaintiffs relied on the Terms of Service or the contained Arbitration Agreements when framing the Complaint.  And "[c]onsulting the terms of the Agreement[s] would not be necessary for [Plaintiffs] to articulate [their] claims in the [Amended] Complaint."  *Lepore*, 2023 WL 8469761 at *3.  The connection between the claims in the Amended Complaint and the Terms of Service is simply too attenuated to conclude that Terms of Service are *integral* to the Amended Complaint. *See Noonan v. Comcast Corp.*, No. 16-0458, 2017 WL 4799795, at *4 (D.N.J. Oct. 24, 2017); *Lepore*, 2023 WL 8469761 at *3 ("[B]ecause the contents of the Agreement are inessential to the articulation of [the plaintiff's] claims, the Agreement is not 'integral to' the Complaint."); *Ross v. CACH, LLC*, No. 12-6321, 2015 WL 1499282, at *2 (D.N.J. Apr. 1, 2015) (denying motion to compel arbitration and ordering limited discovery on arbitrability where the "complaint makes no reference to the Credit Card Agreement; it does not attach the Credit Card Agreement as an exhibit; and it does not base its FDCPA claim on the existence of the Agreement"); *Sauberman v. Avis Rent a Car System, L.L.C.*, No. 7-0756, 2017 WL 2312359, at *2 (D.N.J. May 26, 2017).[13]

---

[13]    Defendant's cited case law does not alter the Court's analysis.  In *Gov't Emps. Ins. Co. v. Mount Prospect Chiropractic Ctr., P.A.*, No. 22-0737, 2023 WL 2063115 (D.N.J. Feb. 17, 2023), *Gov't Emps. Ins. Co. v. Elkholy*, No. 21-16255, 2022 WL 2373917 (D.N.J. June 30, 2022), and *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165 (3d Cir. 2014), the arbitration agreements in question were clearly more integral to the complaints at issue than the Terms of Service here.  In *Mount Prospect*, the plaintiff alleged that the defendants "received payment on fraudulent [personal injury protection] claims, and a prerequisite to receiving such payments [was] execution of [the plaintiff's] CAOB Form, which require[d] assignees to agree to submit any disputes . . . 'in connection with any' [personal injury protection] claims to arbitration."  2023 WL 2063115 at *5.  In *Elkholy*, the relevant document was "central to the Complaint as the impetus for all the [personal injury protection] Benefits at issue."  2022 WL 2373917 at *8 n.3.  And in *CardioNet*, "the arbitration clause at issue appear[ed] in a contract relied upon in the Complaint."  751 F.3d at 168 n.2.  Finally, while Defendant cites to the admittedly factually similar case *Grayson v. BMW of North America, LLC*, No. 22-06103, 2023 WL 4864311, at *2–3 (D.N.J. July 31, 2023), the Court does not find that opinion persuasive, as it merely concludes without analysis that the arbitration agreement at issue was integral to the complaint.  *See id.* at *2 n.2.  As described above, no such similar conclusion is warranted in this case.

While it is true that the Amended Complaint relies on violation of express and implied warranties (*see, e.g.*, Am. Compl. ¶¶ 103–24 & 153–70), nowhere does the Amended Complaint tie these claims to the Terms of Service or the Arbitration Agreements.  The closest the Amended Complaint comes to relying on the Terms of Service, and thus on the Arbitration Agreements within them, is when it states:

> Defendant described Audi Connect and Car Net in its *advertisements, press releases, specifications provided to dealers, information provided to the press, and through other media* as adaptable to changing technologies which it knew would be communicated to consumers either directly or indirectly. Defendant's description included that the Audi Connect 24 and Car Net would function as represented for the life the Class Vehicles indefinitely were express warranties by description under N.J. Stat. [§] 12A:2-313(b).

(Am Compl. ¶ 105 (emphasis added)).  However, while this paragraph lists multiple sources of Defendant's alleged assurances that the connected services would last in perpetuity, it nowhere explicitly lists or refers to the Terms of Service or the Arbitration Agreements contained within. And elsewhere, Plaintiffs specifically point to Volkswagen's and Audi's "New Vehicle Limited Warrant[ies]" and "the express warranty promising to repair and correct Defendant's defect in materials and workmanship (Am. Compl. ¶¶ 48–49 & 163), which Defendant does not argue resides in the Car-Net, Audi Connect, or myAudi Terms of Service.  The vague allusion to "other media" is simply insufficient to conclude that the Terms of Service "establish the right that the plaintiff[s] claim[] was infringed or . . . constitute the unlawful conduct for which . . . plaintiff[s] seek[] to recover." *Lepore*, 2023 WL 8469761 at *2.

Thus, "[u]nder *Guidotti*'s first pathway, . . . the affirmative defense of . . . arbitrability is [*not*] apparent on the face of [the] [c]omplaint, making application of Rule 12(b)(6) inappropriate in this case." *See Horton v. FedChoice Fed. Credit Union*, 688 F. App'x 153, 157 (3d Cir. 2017)

(internal quotations omitted) (emphasis added).  Therefore, evaluating the motion under Rule 56, rather than 12(b)(6), is proper.  *See Guidotti*, 716 F.3d at 776.

Since *Guidotti*, courts within this District routinely deny motions to compel arbitration and allow limited discovery on the narrow issue of arbitrability where the complaint makes no reference to whether the parties agreed to arbitration and the asserted claims do not arise under the parties' arbitration agreement.  *See, e.g.*, *Divoc 91, LLC v. Nat. Essentials, Inc.*, No. 22-249, 2023 WL 2625275, at *3 (D.N.J. Mar. 24, 2023) (denying motion to compel arbitration and ordering limited discovery because the plaintiff's complaint "ma[de] no reference to whether the parties *agreed* to arbitration"); *Torres v. Rushmore Serv. Ctr., LLC*, No. 18-9236, 2018 WL 5669175, at *2 (D.N.J. Oct. 31, 2018) (denying motion to compel arbitration and ordering limited discovery where the agreement, arbitration provision, and class action waiver were not referenced in the complaint and were raised for the first time in the defendant's motion); *Sauberman v. Avis Rent a Car Sys., L.L.C.*, No. 17-0756, 2017 WL 2312359, at *2 (D.N.J. May 26, 2017) (denying motion to compel arbitration and ordering limited discovery where the complaint did not establish on its face that the parties agreed to arbitrate); *Ackies v. Scopely, Inc.*, No. 19-19247, 2020 WL 5757988, at *4 (D.N.J. Sept. 28, 2020); *Aiello on behalf of Landers v. AHC Florham Park LLC*, No. 20-7169, 2021 WL 118931, at *2–3 (D.N.J. Jan. 13, 2021); *Hubbard*, 2019 WL 2866067, at *2, n.1; *Nicasio v. Law Offs. of Faloni & Assocs.*, No. 16-0474, 2016 WL 7105928, at *2 (D.N.J. Dec. 5, 2016).  The Court will follow that course here.

Finally, the Court will defer ruling on the Defendant's separate motion requesting dismissal of Plaintiffs' Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Motion to Dismiss) until deciding, upon Defendant's motion after the close of discovery, whether Plaintiffs' claims are subject to arbitration.  *See Silfee v. Automatic Data*

*Processing, Inc.*, 696 F. App'x 576, 577 (3d Cir. 2017) (holding that "the District Court erroneously ruled on [the defendant's] motion to dismiss before resolving its motion to compel arbitration" and noting that "after a motion to compel arbitration has been filed, the court must 'refrain from further action' until it determines arbitrability" (quoting *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004)); *Manopla v. United Collection Bureau, Inc.*, No. 19-16777, 2020 WL 6938354, at *3 (D.N.J. 2020) ("The Court will therefore order limited discovery on whether Defendant may enforce the Arbitration Provision, and will defer ruling on all other issues raised by Defendant's Motion, such as whether Plaintiff's Complaint should be dismissed for failure to state a claim."). Defendant's Motion to Dismiss is thus denied *without prejudice*.

## IV.   CONCLUSION

For the reasons stated above, Defendant's Motion to Compel Arbitration is **DENIED,** *without prejudice* to its ability to renew, pending limited fact discovery on the issue of arbitrability, its arbitrability arguments in a motion for summary judgment pursuant to Rule 56. Defendant may file a renewed motion to compel arbitration under Rule 56 and/or a renewed motion to dismiss within thirty days of the close of discovery. Defendant's Motion to Dismiss is likewise **DENIED** *without prejudice*. Defendant may renew any such motion after the Court decides, upon Defendant's motion after the close of discovery, whether Plaintiffs' claims are subject to arbitration. Plaintiff Lane's claims are **DISMISSED** *without prejudice*. An appropriate Order follows.

**Dated:** March 19, 2024                                        *s/Esther Salas*
                                                                **Esther Salas, U.S.D.J.**